UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TANDY L. HAIRSTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV00076 ERW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

The matter comes before the Court on Tandy Hairston's Petition under 28 U.S.C § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [doc. #1], limited to that part of Ground Three, regarding alleged ineffectiveness of counsel of Phillip Kavanaugh and William Wynne, for failure to challenge the loss amounts attributable to Petitioner in calculation of the determined Total Offense Level under the United States Sentencing Guidelines. On February 18, 2006, Mr. Stephen R. Welby was appointed to represent Petitioner at an Evidentiary Hearing conducted on April 6, 2006. Petitioner's post-hearing memorandum was filed April 24, 2006. Respondent's responsive brief was filed May 2, 2006. Petitioner's reply brief was filed June 7, 2006. All other Grounds of Petitioner's Petition were dismissed in a Memorandum and Order of this Court dated February 6, 2006. For reasons hereafter stated, and based on the statement of Background Facts, Standards for Relief and Discussion in that February 6, 2006 Order; the evidence from the April 6, 2006 Hearing; and briefs of counsel; remaining claims under Ground Three and the Supplement are dismissed.

# I. BACKGROUND FACTS

The statement of Background Facts, Standards for Relief and Discussion sections from the February 6, 2006 Memorandum and Order are incorporated herein by this reference. Supplementing those facts, Petitioner plead guilty to Counts I, V, X, XI and XIV of the Indictment on March 22, 2004. Mr. Howard Marcus, Assistant United States Attorney, recited into the record, in very significant detail, the allegations of the indictment which filled ten (10) transcript pages, in the presence of Petitioner. Petitioner was immediately questioned by the Court:

> Q. All right. Do you understand the charges that are pending against you at this time, Mr. Hairston?
> A. Yes, sir.

(Change of Plea Hearing 3-22-04 p. 9, l. 2 - p. 19, l. 8).

At the Change Of Plea Hearing, Petitioner was represented by G. William Wynne. At first, Petitioner said, in response to the Court's inquiry, that he had not previously been represented by anyone, other than Mr. Wynne. Mr. Marcus interrupted, explaining that he had met previously with Mr. Barry Short and Eric Tolen, persons known by the Court to be criminal defense attorneys. Mr. Wynne interrupted and volunteered the name of Justin Meehan, another criminal defense attorney who had represented Petitioner. Mr. Marcus then mentioned Burt Shostak, still another well-known criminal defense attorney who had represented Defendant. Petitioner said he had no complaints to make against Mr. Shostak, Mr. Meehan, Mr. Short, Mr. Tolen or Mr. Wynne. All except Mr. Wynne were involved in Petitioner's defense at the pre-indictment stage. As to those lawyers, when asked if he was satisfied with their services, Petitioner said, "[t]hey all basically gave me just runabouts, and I wanted to talk to the prosecutor before the indictment, but no one would give me actual - - actual - - you know what I'm saying, what's the indictment

involve." As to Mr. Wynne, Petitioner said he was entirely satisfied with the services of Mr. Wynne, "[e]xcept that I wanted to go over the plea agreement , but I just got it Friday, and I'm pleading Monday." (Change of Plea Hearing p. 22, l. 6-12). These sworn statements of Petitioner are significant, when compared to his sworn testimony at the April 6, 2006 Hearing, bearing upon this Court's conclusion that Petitioner is not to be believed. Under oath at the Change of Plea Hearing, Petitioner was asked, after acknowledging that Mr. Wynne was his attorney in this case, "[h]ave any other attorneys assisted you in this case in any way other than Mr. Wynne?" Petitioner answered, "[n]o, no, sir." At the April 6, 2006 Hearing, Mr. Marcus, Assistant United States Attorney, asked Petitioner, "you've been represented by a series of attorneys in this matter, have you not?" After answering "yes," this exchange followed:

> Q.  Initially, you had Eric Tolen as a lawyer?
> A.  He solicited my business.
> Q.  And you appeared in the office of the U.S. Attorney with Mr. Tolen?
> A.  He was soliciting my business.
> * * *
> Q.  And after that you were represented by, after Mr. Tolen, Barry Short, and you appeared in the office of the U.S. Attorney with Barry Short?
> A.  I appeared in the office with him. He was soliciting my business.
> Q.  And for a period of time you were represented by Mr. Burt Shostak.
> A.  I appeared with him. He was soliciting my business.
> Q.  It's a "yes" or "no" answer. Did he represent you or not?
> A.  I really don't know how to answer the question.
> Q.  Well, well move on. Did you appear down at the U.S. Attorney's Office along with Mr. Shostak or Mr. Shostak's associates and FBI Special Agent Howard Marshall who played you tapes of a wiretap to listen to?
> A.  Me with Mr. Shostak?
> Q.  Yes.
> A.  He came to a handwriting sample to me.
> * * *
> Q.  After Mr. Shostak, were you represented by Justin Meehan?
> A.  Yes sir.
> Q.  After Mr. Meehan, were you represented very briefly by Brad Dede, and Mr. Dede had to excuse himself due to a conflict?
> A.  Brad, yes, sir.
> Q.  And then you retained Justin Meehan?
> A.  Justin Meehan? No, sir.

Q.  Did Justin Meehan represent you in this matter?
A.  No, sir.  He represented me at the bond hearing.
Q.  Let's go back.  You appeared in court with Mr. Meehan.
A.  For a bond hearing, yes, sir.
Q.  As a matter of fact, you and Mr. Meehan sat down with the FBI and discussed loss figures and looked at charts and looked at documents.  Is that correct?
A.  Yes, sir.  I opposed it, but he tricked me down there, yes, sir.
Q.  So Mr. Meehan tricked you down to coming to meet with the FBI and look at loss charts and loss figures?
A.  Yes, sir.
Q.  And at that meeting with Mr. Meehan, you were told that you had processed or reviewed or looked at approximately1200 loan applications   that were submitted through your office?
A.  I don't recall the discussion with the FBI.
Q.  And you were told that you were either funded or approved for about 60 million dollars in loans.  Do you recall that?
A.  Yes, sir.
Q.  Do you recall being told that of those 60 million dollars, in loans that you had processed, approximately one in three of those loans contained some detectable form of fraud?
A.  *THE ACTUAL NUMBER WAS 21 MILLION.*  (Emphasis supplied).
Q.  So that would be 21 million out of 60 million dollars in loans.  Twenty-one million dollars in loan had some form of detectable fraud in there?
A.  Alleged fraud, yes sir.
Q.  And the concept of intended loss was explained to you in detail, was it not?
A.  No, sir.
Q.  You were told that potentially you could have been at a level 38 or higher if, in fact, the 20 million-dollar level was proved?
A.  No, sir.  No one ever told me anything about a level 38.
Q.  You were present for that conversation?
A.  Excuse me?
Q.  You were present for that conversation in which losses were discussed?
A.  No one ever told me about a level 38.
Q.  But they did tell you about the 21 million dollars in fraud.  That, you remember?
A.  They said that - - you told me that you had reviewed approximately 21 million dollars in loans that contained some form of fraud, and I remember that, yes, sir.
Q.  And shortly thereafter, you would have discharged Justin Meehan and then you would have retained Bill Wynne?
A.  I had never hired Justin Meehan.
Q.  Did you hire Bill Wynne?
A.  Yes, sir.

(April 6, 2006 Rough Draft of Tr. p.42, l. 25 - p. 47, l. 11).

At the April 6, 2006 hearing, Mr. Marcus asked Petitioner if he wanted to plead guilty at the Change of Plea Hearing. Petitioner said, "[y]es, sir." Mr. Marcus reminded him that there was a time in the Change of Plea Hearing when the Court stopped the hearing, and Petitioner "virtually pled with the Court to come back and take your guilty plea." When Petitioner testified, "[m]y attorney asked the Judge to continue[,]" the Court interrupted, and said, "[w]ait a minute. Now that's not right. I remember that stone cold. That's not right." (April 6, 2006 Tr. p.55, l. 17 - p. 56, l. 2).

The Change of Plea Hearing transcript further reveals Petitioner's prevarication. He was asked by the Court, "[o]kay. Other than this agreement, has anyone at any time made any other or different promises, representations, or assurances to you or has anyone made any threats against you whatsoever, in an attempt to get you to enter a plea of guilty in this case?" Petitioner answered, "No, sir. They just told me if I didn't plead guilty today, that I'm going to be facing a lot more time." The Court followed with this statement, "[o]kay. You know, I think this is - - I think - - I think what is happening here, quite honestly, is that you don't want to plead guilty and you're - - " Petitioner interrupted, "I do want to plead guilty." The Court followed, "- - giving me the impression that it's somebody else that's talking you into it, and I think I'm going to call this off and just go ahead with the trial." Petitioner stated, "[h]ey, Judge, I mean, I know you don't believe me. I'm a hundred percent want to plead guilty." Petitioner has a proclivity to align his testimony with a position he feels will be most beneficial at a particular time. Petitioner is not a believable witness.

It was very clear at the Change of Plea Hearing that Petitioner was not satisfied with the amount of loss for which the Government claimed he would be responsible for United States

Sentencing Guideline purposes, and for the amount of restitution for which he would be held accountable at the time of sentencing. It is clear from the Change of Plea Hearing transcript that Petitioner was clearly advised of his right and opportunity to challenge the amount of loss for which the Government claimed he would be responsible at the Sentencing Hearing. After the Court announced the calculations under the United States Sentencing Guidelines, the Court stated, "[a]s we've already talked, at the time of sentencing, if the Defendant can prove that the losses were less than $2,500,000.00, then the 13 levels will be something - - the levels will be something less than 13." The Court noted at the Change of Plea Hearing that Petitioner's total offense level had been agreed by the parties to be calculated at a level no higher than 26. (April 6, 2006 Tr. p. 38, l. 2 - p.39, l. 12). Later in the hearing, the Court told Petitioner, "I will be unable to determine the applicable Guideline sentence for your case until after the presentence report has been completed, Mr. Wynne, Mr. Marcus have had an opportunity to read and review the report. After receiving and reading the report, you will have an opportunity to file objections to the report and to challenge any findings in the presentence report. Do you understand that?" Petitioner answered, "[y]es, sir." The Court then advised him, "[w]e talked a little bit about that awhile ago [it] is, the terms of the amount of the loss. If you challenge that, you will have a right to bring in evidence to challenge that. Do you understand?" Petitioner responded, "[y]es, sir."

At the Change of Plea Hearing, the Court invited Mr. Marcus to state into the record facts he believed he could prove if called upon to present evidence at a trial. Mr. Marcus responded:

> MR. MARCUS: Your Honor, the facts that the Government would prove would be consistent with the indictment. As stated, the basic scheme was to obtain funding from the bank warehouse lenders by means of fraud. By submitting false and fraudulent documents to them, they would then extend credit to the Defendant.
> The second aspect of the fraud would be to induce the mortgage investors to purchase the mortgage from the Defendant by means of fraud. This involved sending, as stated in the indictment, false W-2's, tax returns, appraisals, check

6

stubs, verifications of deposits, verifications of employment, basically anything that would induce the investor or lender to release the funds or purchase the mortgage. This was usually accomplished by using a wire. Typically, fax was used. Sometimes, email was used. Sometimes, the mail. Sometimes, interstate commercial carriers. There was an interstate nexus, shipping documents from St. Louis, Missouri, to -- the Eastern District -- to various locations out of state and vice versa, shipments of documents from the investors as well as the warehouse lenders from out of state -- they were all located outside of Missouri -- to St. Louis. The investors included Saxon Bank, National City Bank, Indymac Bank, Centex, Commonwealth United, Flagstar, and Key Bank.

The Defendant, as indicated before, had a series of appraisers who were willing to alter appraisals to allow the loans to be funded as well as to allow the mortgages to be purchased. Flaws or fraud the appraisals concealed -- concealing flaws, concealing the seasoning, artificially inflating the values, listing the appraisals "as is" when they should have been "as repaired".

The other aspect of the fraud involved Nations Investment, the acquisition and sale of distressed property to buyers. Typically, the houses were purchased for very low amounts of money. They then, in turn, were -- they usually had minimal amount of rehab done, and then they were sold to investors with the promises they'd be complete at closing. It typically involved a fraudulent appraisal in which the value was much higher than it was truly worth.

Typically, in all these transactions, the Defendant or others would create down payments or pay down payments for the borrowers, pay their closing costs. None of the lenders or investors were aware of this.

The Defendant also made a series of fraudulent loans to Mark Williams, Terrence Cohen, Orville Johnson. They were investors. **THE EVIDENCE WOULD SHOW THE DEFENDANT MADE APPROXIMATELY 21 MILLION DOLLARS IN LOANS CONTAINING SOME DETECTABLE FORM OF FRAUD. THIS RESULTED IN LOSSES AS WELL AS INTENDED LOSSES BETWEEN $2,500,000 AND $5,000,000.**

**THE COURT: ALL RIGHT.**

**MR. MARCUS: THAT WOULD BE INTENDED AND ACTUAL LOSSES. (emphasis added).**

The evidence on Count I is consistent with the indictment in which they basically sold a property to a straw buyer; they induced a lender to release funds to The Loan Store; they induced Indymac to purchase this by fraud.

As to Count V, this was in regards to the master loan agreement in Concord, California. The Defendant caused false tax returns to be sent to Concord so they, in turn, would continue his line of credit. They would have cut it off had they been aware of it.

As to Count X, this is to the 3070 Waterford property in St. Louis County, Missouri. The Defendant induced Ms. Davidson to sell the house to the Defendant's wife, Kiara Cason. In order to qualify Kiara Cason for a loan, he needed to use false and fraudulent W-2's, tax returns, check stubs. This down payment came from Billy Miller and Mark Williams. As part of this straw purchase that was created, Nations Investment pulled off $63,997 via a false lien that was

filed on the house. On or about June 5th of 2001, Centex sent the Defendant or others at The Loan Store a correspondent prepurchase review form.

As to Count XI, this centered around the 4388 Margaret Ridge property in which Mark Williams bought it from Terrence Williams. The Defendant contributed false documents to this particular loan to qualify the Defendant for the loan. Mark Williams contributed false documents to this particular loan package to qualify him for the loan. This caused Key Bank to purchase the particular mortgage, and April 20th of 2001, the Defendant Mark Williams caused a credit prequalification certificate to be sent from The Loan Store in St. Louis to Key Bank in Illinois via fax and interstate commerce. The Defendant had a source for false W-2's as well as Mark Williams had a separate and independent source of false documents.

As to Count XIV, that is a conspiracy which substantially tracks all the fraud in this case, all the scheme to defraud, and it involved the obtaining of false funding from the warehouse lenders, the purchase of various mortgages by the investors, as well as the sale of Nations Investment property. This was all achieved by false wires, faxes, and mailings, and that would be substantially the Government's evidence.

(Change of Plea Hearing 3-22-04 p. 25, l. 21 - p. 29, l. 13).

When asked if he had an opportunity to read the plea agreement, Petitioner at first said, "I was recommended by my lawyer to sign it." The Court advised him, "[o]kay. Well, that's not good enough. The question is, have you had an opportunity to read it." Petitioner answered, "[o]kay, I've read it, sir." When asked if there were any other deals or agreements, other than the plea agreement, Petitioner expressed concern about the 2.5 to 5 million dollars in losses stated in the agreement. After being advised by Mr. Wynne, that the amount of loss would be considered at the sentencing hearing, then Petitioner said, " . . . I don't exactly understand it, but I'm willing to plead guilty, you know what I'm saying, to it because - -" The Court interrupted, stating, "[w]ell, you know, you never want to - - you never want to plead guilty to anything you don't understand, and, you know, I wouldn't permit you to plead guilty to something you don't understand . . ." The Court asked him again if there were other understandings or agreements or deals other than the specific plea agreement. Petitioner, instead of answering the question, asked, "[t]he question is this. My attorney have *(sic)* asked me that - - because I told him that no one

8

has lost 2.5 million with my business, with my business adventures . . . my restitution, whatever I

owe to the people, be based on the actual loss?"  The Court explained that the Government

alleged the loss range was between $2.5 million and $5 million and at the time of sentencing, he

could present witnesses to prove the loss was less than $2.5 million.  He was later asked if anyone

at any time had made any other different promises, representations, or assurances or threats

against him in an effort to get him to plead guilty.  It was at this point, as already noted, that

Petitioner then stated, "[n]o sir.  They just told me if I don't plead guilty today, that I'm going to

be facing a lot more time."  The Court then advised Petitioner that it was the Court's view that he

did not want to plead guilty, and "I'm going to call this off and just go ahead with the trial."

Petitioner then said he wanted to plead guilty.  Mr. Wynne said that the process had been stressful

on Petitioner, and that he had been concerned about the impact of the restitution on his family.

After further assurances by Petitioner, the proceeding continued.  (Change of Plea Hearing p. 31,

l.2 - p. 36, l. 17).

Next, the impact of the United States Sentencing Guidelines was discussed:

> THE COURT:  Furthermore, that the 2002 edition of the  Guideline manual was used, that you and the Defendant are agreeing that his base offense level will be no higher than 6?
> MR. MARCUS: Your Honor, the Government used the 2000 manual that was in effect at the time.
> THE COURT: All right. Very well. And that's the most favorable manual to the Defendant?
> MR. WYNNE: That's correct, Your Honor.
> MR. MARCUS: That's correct.
> THE COURT: That the Chapter 2 enhancements -- there will be no more than a 13-level enhancement under 2F1.1(b)(1)(N) because the losses and intended losses were more than $2,500,000, but less than $5,000,000; is that also true?
> MR. MARCUS: That's correct, Your Honor.
> THE COURT: As we've already talked, at the time of  sentencing, if the Defendant can prove that the losses were less than $2,500,000, then the 13 levels will be something -- the levels will be something less than 13?
> MR. MARCUS: It will be up to the Court's determination.

THE COURT: All right. No more than two levels will be added under 2F1.1(b)(2)(A) and (B) because more than minimal planning was involved?

MR. MARCUS: That's correct, Your Honor.

THE COURT: That no more than two levels will be added under 2F1.1(b)(3) because the offense was committed through mass marketing?

MR. MARCUS: That's correct, Your Honor.

THE COURT: Under Chapter 3, no more than four levels will be added under 3B1.S because the Defendant was an organizer or leader of a criminal activity?

MR. MARCUS: That's correct, Your Honor.

THE COURT: No more than two levels will be added under 3B1.3 for abuse of trust and use of a special skill?

MR. MARCUS: That's correct, Your Honor.

THE COURT: The total offense level, it is recommended, will be no higher than 26?

(Change of Plea Hearing p. 37, l. 24 - p. 39, l. 12).

Later in the proceeding, the Court advised Petitioner of the possible application of the

United States Sentencing Guidelines:

Q.      Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued Guidelines for judges to follow in determining the sentence in a criminal case. Do you understand that I am required to follow those Sentencing Guidelines?

A.      Yes, sir.

Q.      We have talked a little bit about Sentencing Guidelines here today, and there are also provisions in your agreement for Sentencing Guidelines. Have you and Mr. Wynne talked about possible application of Sentencing Guidelines for your case?

A.      Yes, sir.

Q.      Do you understand that the sentence imposed may actually be different from any estimate that you may have expected or that your attorney may have given to you?

A.      Yes, sir.

Q.      I will be unable to determine the applicable Guideline sentence for your case until after the presentence report has been completed, Mr. Wynne, Mr. Marcus have had an opportunity to read and review the presentence report. After receiving and reading the report, you will have an opportunity to file objections to the report and to challenge any findings in the presentence report. Do you understand that?

A.      Yes, sir.

Q.      We talked a little bit about that awhile ago. That is the terms of the amount of the loss. If you challenge that, you will have a right to bring in evidence to challenge that. Do you understand?

A. Yes, sir.

Q. Are you aware that after the Guideline range appropriate in your case has been determined, that I have the power or authority under some circumstances to depart from the Guidelines and impose a sentence that is more severe or perhaps less severe than the sentence called for by the Guidelines?

A. Yes, sir.

Q. Do you know that parole has now been abolished and if you are sentenced to a term of imprisonment, you will not be released on parole?

A. Yes, sir.

Q. By signing this agreement, Mr. Hairston, you are waiving certain appellate rights you have. You are -- you still have a right to challenge any upward departure that I would try to make at the time of sentencing by appeal. Also, you waive all rights to contest the conviction or sentence in any postconviction proceeding, including one under Title 28 United States Code § 2255, except you may appeal based on prosecutorial misconduct or ineffective assistance of counsel. Other than those reserved rights, all of your other appellate rights are waived. Do you understand?

A. Yes, sir.

(Change of Plea Hearing p. 41, l. 20 - p. 43, l. 20).

It is clear from the record at the Change Of Plea Hearing that Petitioner was concerned about the amount of loss for which he would be held accountable. At the Sentencing Hearing on July 8, 2004, Petitioner was represented by Phillip Kavanaugh. The following questions were asked and the following answers were given at that Hearing:

THE COURT: All right. Mr. Kavanaugh, have you, sir, and has Mr. Hairston received and reviewed a copy of the [presentence] report?

MR. KAVANAUGH: Your honor, we've received a copy. We've gone over it. We've discussed it.

THE COURT: All right. And I noted that there were objections. I thought some were resolved. I wasn't sure if all had been resolved.

MR. KAVANAUGH: Your Honor, we did file objections regarding a two-level enhancement for mass marketing. As the Court knows, we were not the original attorney of record. We looked into the matter, we investigated it, and at this time, I would ask leave of Court to withdraw those objections.

THE COURT: All right.

MR. KAVANAUGH: I've consulted with Mr. Hairston. I've explained to him why they do not apply in this case, and instead of filing a lot of last-minute paperwork, which e-filing may not work, I'd rather just do it in open court orally. I've already informed the Government and Probation that we would withdraw the objection.

THE COURT: Very well. They are withdrawn. Is that with your permission, Mr. Hairston?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Very well. Thank you. The Court adopts as true the factual statements contained in the presentence report. I shall now -- as the Court's findings of fact. I shall now make calculations under the United States Sentencing Guidelines in the case. The 2000 edition of the Guideline manual was used in this case. The base offense level for violation of 18 United States Code 1343 and 2 is found in 2F1.1(a) of the manual. The base offense level is 6. The loss was between two million and $500,000 but less than five million dollars. Thirteen levels are accordingly added under 2F1.1(b)(1)(N). Two levels are added because more than minimal planning and a scheme to defraud more than one victim was involved under 2F1.1(b)(2)(A) and (B). Two levels are added because the offense was committed through mass marketing under 2F1.1(b)(3). Four levels are added because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive under 3B1.1(a). Two levels are added because the Defendant abused a position of trust or use of a special skill under 3B1.3. Three levels are reduced for the Defendant's full and timely acceptance of responsibility under 3E1.1 (a) and (b) (1) and (2). And the total offense level accordingly is 26. The Defendant's criminal history category is at a minimum; it is I. The Sentencing Guideline range is from 63 months to 78 months. At this time, do you have any lawful cause or reason to assign to the Court, Mr. Hairston, as to why the judgment of the Court should not now be pronounced upon you, sir?

THE DEFENDANT: No, sir.

(Sentencing Tr. p. 2, l. 1 - p. 4, l. 22)

Petitioner was given an opportunity to speak at the Sentencing Hearing, but did not address the amount of the loss after the Court made calculations under the United States Sentencing Guidelines. Petitioner said very little:

MR. HAIRSTON:   I'd just like to tell the Court that I'm sorry and to my mother, I'm sorry.

THE COURT: All right. Thank you, sir. All right. Thank you very much.

Mr. Kavanaugh asked the Court to waive the fine in the case, "[g]iven the enormous restitution in this case . . ." The Court then announced the sentence and judgment, stating that the losses to victims were $2,424,857.00. Under the Mandatory Restitution Act of 1996, restitution to the victims in the amount of $2,424,857.00 was ordered. Nothing appears in the sentencing

12

transcript to suggest that Petitioner thought the amount of loss was inaccurate.  Neither he nor his

counsel, Mr. Kavanaugh, mentioned anything about the amount of the loss at the Sentencing

Hearing.  However, at the April 6, 2006 hearing, Petitioner presented quite a different view of

how Mr. Wynne and Mr. Kavanaugh violated his constitutional rights, concerning the amount of

loss for which he was held accountable for United States Sentencing Guideline purposes.

Petitioner acknowledged in his testimony on April 6, 2006, when questioned by Mr.

Marcus, that in the Plea Agreement, "losses as well as intended losses were between

$2,500,000.00 and $5,000,000.00," and "[n]ot just hard losses, actual losses, but loss and

intended loss.  Is that correct, sir?" Petitioner answered, "[y]es, sir." (April 6, 2006 Tr. p. 55, l. 5

- 16).  Before the Sentencing Hearing, Mr. Kavanaugh observed that Petitioner was very insistent

that he file an objection to the two-level enhancement for "mass-marketing," and the objection

was filed.  On the day of Sentencing, the objection was withdrawn.  Mr. Kavanaugh testified it

was withdrawn at Petitioner's request, after it became known in the community that the

Government was interviewing witnesses preparing for the Sentencing Hearing on the mass-

marketing issue.  In his April 6, 2006 testimony, Petitioner testified that he agreed the objection

should be withdrawn.[1]  (April 6, 2006 Tr. p. 59, l. 18 - p. 60  L.4 ).  The following testimony

---

[1]Stephen Williams testified that Petitioner called him, after the objection to the pre-
sentence report was filed on Petitioner's behalf, challenging the United States Sentencing
Guidelines enhancement for Mass Marketing, advising Mr. Williams that "the Government had
people out on the streets talking to witnesses and that they were going to be called in to testify
about this mass marketing objection to substantiate it, and it would - - And so we talked about,
well, maybe the best thing to do would be to withdraw the objection because just like with - -
what we had discussed with the other possibilities with intended loss, the concern was, well, if we
persist in the objection and it's proven to be just baseless, then we're running into a potential
problem with other adverse consequences." (April 6, 2006 Tr. p. 108, l. 9 - 18).

concerning withdrawal of the objection to the mass marketing is reported with questions being asked by Mr. Marcus:

> Q.    And did you agree with them to withdraw that objection?
> A.    Yes, sir.
> Q.    And I asked you, "Is that with your permission?" And you gave them permission to do so, right?
> A.    Yes, sir.
> Q.    Now at this point did you tell the Court, "Your Honor, I want to challenge the losses?
> A.    No, sir.
> Q.    Did you tell the Court, "My lawyers aren't doing what I ask?"
> A.    No, sir.
> Q.    You had every opportunity to raise this objection at sentencing, didn't you?
> A.    I understand that - - I mean I don't know.
> Q.    You were in court. You were at this very podium that I'm standing at today, correct?
> A.    I guess so, yes, sir. I'm not sure. I think so, yes, sir.
> Q.    And you didn't say, "Judge, stop the sentencing. My lawyers are letting me down," did you?
> A.    No, sir.
> Q.    You didn't say you were unhappy with your sentence, did you?
> A.    No, sir.
> Q.    You knew going in exactly what your guidelines were, didn't you?
> A.    I knew what my guideline level were (sic), what I was facing, yes, sir.
> Q.    You got a guideline level of 63 to 78 months?
> A.    Yes, sir, I already knew that.
> Q.    And the Court only gave you 64 months, one month over the minimum?
> A.    Yes, sir.

(April 6, 2006 Tr. p. 59, l. 25 - p. 61, l. 9).

Petitioner confesses that he made no objection to the 64-month sentence at the Sentencing Hearing.[2] The Court concludes, based on the believable testimony of Mr. Kavanaugh and Mr. Williams that they thoroughly discussed the matter of whether to challenge the Government's calculations of actual losses and intended losses, and Petitioner agreed with them before the

---

[2]As ruled in the February 6, 2006 Memorandum and Order, the Court ruled that Petitioner's sentence was improperly structured under the United States Sentencing Guidelines and an Amended Judgment [doc. #253] was entered on February 8, 2006.

Sentencing Hearing that the proof of intended losses was so great, that if an objection was made to the range of losses, between $2,500,000.00 and $5,000,000.00, to gain a reduction in the Total Offense Level under 13, there was a risk of losing the three-point reduction for acceptance of responsibility, and there was a basis, in fact, for the Government to prove intended losses of several million dollars, beyond $5,000,000.00. Petitioner was informed of these risks by Mr. Kavanaugh before the Sentencing Hearing, and accordingly, no objection to the recommended calculations in the Pre-sentence Report was made by or on behalf of Petitioner. He admits that Mr. Wynne and Mr. Meehan discussed intended losses with him, and then, although he volunteered earlier that there were alleged fraudulent loans of $21,000,000.00, he later testified, "[n]o one ever told me that 18 million dollars contained fraud." (April 6, 2006 Tr. p. 63, l. 7 - 20).

Later, the focus switched to properties in Atlanta, Georgia, and Petitioner was questioned about discussions he had with his attorneys over those properties. He was asked, "[d]id you discuss those with your attorneys?" He testified, "[h]e discussed that I - - that the Government had went through 60 million dollars in loans. He said 21 million had contained some form of fraud, including two properties that I tried to purchase in Atlanta." (April 6, 2006 Tr. p. 66, l. 4 - 8). He denies knowing about 18 million dollars in fraudulent transactions, then admits being told about 21 million dollars in loans containing some fraud.

The scope of representation by Phillip Kavanaugh and Stephen Williams of Petitioner is limited to the sentencing. He is a well-experienced criminal defense lawyer, practicing in federal court for the last sixteen years. Petitioner first presented himself to Mr. Kavanaugh who claimed he had been "railroaded" by Mr. Wynne. Mr. Kavanaugh gave Petitioner a copy of the indictment and plea agreement and told Petitioner to supply as much detail as possible as to Petitioner's

15

objections to them. Mr. Kavanaugh was concerned about Petitioner's assertions of his innocence based on the detail of the indictment which suggested to him that co-defendants had already proffered against Petitioner. "It's almost like a road map about criminal activity that involved Mr. Hairston and his co-defendants. So when he tells me he's not good for it, I'm concerned." (April 6, 2006 Tr. p. 75, l. 25 - p. 76, l. 2). Contrary to Petitioner's asseverations, Mr. Kavanaugh and Mr. Williams made the necessary inquiries regarding Petitioner's claims of actual innocence which were found to be without merit. Proof of Petitioner's guilt was very substantial.

Mr. Kavanaugh mailed three letters to Petitioner seeking his assistance in reviewing documents in anticipation of the Sentencing Hearing. The first is dated May 25, 2004. Mr. Kavanaugh asked Petitioner to review the Pre-sentence Report for completeness and accuracy. He then reminded Petitioner to "go over the plea agreement paragraph by paragraph regarding completeness and accuracy. Please do the same thing with your presentence report." After the reviews, Mr. Kavanaugh invited Petitioner to contact his office for a three-hour appointment. (Gov. Ex. A). On May 27, 2006, Mr. Kavanaugh sent Petitioner the second letter. He asked Petitioner to review the documents above mentioned in Government's Exhibit A and requested detailed information from Petitioner concerning mistakes and inaccuracies. Mr. Kavanaugh wrote, "[w]e need to be able to reference your version and research same to find an alternative explanation." (Gov. Ex. B). The third letter, dated June 9, 2006, is a plea for Petitioner's cooperation. It details how his assistance is very important. It ends, "[u]nless we can supply the sentencing court with tangible evidence contrary to that presented by the probation officer and the prosecutor, you will be left to face the sentencing ranges as indicated in your presentence report. . ." (Gov. Ex. C). Mr. Kavanaugh said he did not get a response from Petitioner regarding the requested assistance with the supplied documents. His testimony is believable. Mr. Kavanaugh

did get Government documents. Mr. Kavanaugh reviewed the Government's evidence and based upon the review of the Government's evidence, Mr. Kavanaugh testified, "I told Mr. Hairston a number of times that if he breached his plea agreement and we pursued a sentence under a theory of actual loss, number one, that's a departure because the *Guidelines* mandate that you start with intended loss . . . So if we pursue actual loss, the Government could claim a breach, and that would open the door to other losses that we were aware of. We knew there were other potential losses out there that were not identified in these charts,[4] and specifically these properties in Atlanta was one of the things we specifically discussed with him because there were actually fraudulent tax matters that were involved with that . . ." (April 6, 2006 Tr. p. 79, l. 14 - p. 80, l. 1). Mr. Kavanaugh told Petitioner there was a risk that he could be charged with other crimes. He explained to Petitioner, with a *Guidelines* book on his lap, that even if "you get everything you're asking for, you're going to be two levels lower, and your guideline range is going to be 57 to like 63 months." Mr. Kavanaugh explained to Petitioner that the risk was too great. "And after discussing matters with Mr. Hairston, he never asked you to challenge the losses?" Mr. Kavanaugh answered, "[n]o, never." (April 6, 2006 Tr. p. 82, l. 17 - 19). Additionally, Petitioner never asked Mr. Kavanaugh for an exact number of the intended loss.[5]

---

[4]The charts were exhibits prepared by the Government.

[5]In his brief, Petitioner relies on *United States v. Staples*, 410 F.3d 484 (8th Cir. 2005). The facts of that case do not resemble those discussed here. There, defendant issued a "fake"check in the amount of $249,493.00 to the title company as purchase price of a house. There was an agreement between the parties that the actual loss was about $161,000.00; there was no agreement as to the intended loss. The issue was whether the value of the house that a reasonable person thought the house would be worth at the time of the fraud, should be deducted from the intended loss. The District Court erroneously adopted the Government's view, declining to deduct the apparent value of the house.

The Court of Appeals gives valuable instruction in determining a defendant's intent when considering intended loss. Absent evidence of defendant's intent, the size of the maximum loss that a fraud could have caused is circumstantial evidence of the intended loss. The maximum

Stephen Williams is also an Assistant Federal Public Defender who assisted Mr. Kavanaugh with Petitioner's sentencing issues. Mr. Marcus asked Mr. Williams, referring to Petitioner, "[d]id he ever say, 'Hey, challenge the losses,' after you discussed things once you reached the conclusion?" Mr. Wlliams answered, "[n]o. I mean he agreed with the strategy. That is definitely the case." (April 6, 2006 Tr. p. 107, l. 3 - 6). Mr. Williams testified that he and Mr. Kavanauugh had explained the concept of intended loss to Petitioner. He said that he and Mr. Kavanaugh conveyed to Petitioner that the total amount of the loans "that had some fraud in them . . .was 21 million . . . and he did not dispute that at all . . . I mean he did not dispute that at all. What his concern was was with the actual loss. And we indicated to him, 'well, there's a problem. These aren't the sum total of the loans that you were involved in. We know that. We don't know what the top end is going to be . . .'" (April 6, 2006 Tr. p. 118, l. 2 - 12). Mr. Williams testified that he and Mr. Kavanaugh "were concerned about two things. First of all, opening up the possibility that in the end, the losses that would be perceived by the Court would be in excess of five million. That was the one thing and the potential for breaching the plea agreement by not agreeing with those calculations which were specific factual stipulations. I

_____

possible loss is computed from the perspective of a reasonable person in the defendant's position at the time of the fraud.

In *Staples,* the district judge failed to adopt defendant's argument that a reasonable person would have known that the house could be sold by the bank to mitigate damages. The court of Appeals ruled that collateral should be considered in determining intended loss attendant to transactions like the one *involved in this case.* (emphasis supplied). If a reasonable person intends that collateral revert to the defrauded party, then there is no intention by defendant to obtain the value of that collateral. The Court noted that defendant's intent is the "touchstone."

In the present case, Petitioner was a loan broker, not a home purchaser. He confesses that he was involved in loan transactions of $21 million dollars that involved some fraud. All of the security interests in many properties in which Petitioner had some role were not foreclosed at the time the Petitioner was sentenced. Petitioner wants to ignore the size of the maximum loss that his fraud *could have caused.* The maximum possible loss from the perspective of a reasonable person in defendant's position at the time of the fraud would likely have been in excess of $5 million dollars. His attorneys wisely protected him from a harsher guideline sentence.

mean those were factual stipulations, twenty-one million which we didn't dispute and 2.5 to 5 which he did dispute in terms of the actual loss." (April 6, 2006 Tr. p. 119, l. 7 - 15). All of these decisions were made, understanding that if Petitioner had prevailed in proving actual losses were less than $2.5 million and the Government had not borne its burden on intended losses, there would have been only a one, or possibly a two-point reduction in the total offense level. Mr. Wynne, Mr. Kavanaugh and Mr. Williams all concluded that the risks in attempting to diminish the amount of actual loss, under all of the circumstances, were too great.[6] These decisions are well with in the scope of sound trial strategy.

### D I S C U S S I O N

Petitioner raises four arguments for relief in the Third Ground of his Petition under 28 U.S.C § 2255 to Vacate, Set Aside, or Correct Sentence [doc. #1]. The first three arguments have already been denied in the Court's February 6, 2006 Memorandum and Order. Petitioner filed a Motion To Amend 28 U.S.C. 2255 on September 8, 2005. In that Motion, he claims,

> [c]ounsel (William Wynne) was ineffective for advising petitioner to plead guilty to intended losses for the purposes of sentencing where in fact, petitioner should have only plead guilty to actual or expected losses to victims for purposes of sentencing.

The fourth argument of Ground Three and his supplement are without merit.

Borrowing from the February 6, 2006 Order, the Court will here restate the nature of Petitioner's remaining claims:

> Petitioner's final argument with respect to Ground Three is that counsels' assistance at sentencing was deficient because Mr. Kavanaugh failed to object to the $2.5 to $5 million intended loss amount that formed the basis of his sentence

---

[6]Petitioner argues that an expert should have been hired to calculate the exact amount of the intended losses. Petitioner admitted that there were $21 million in losses in his processed loans involving some fraud. Many foreclosures had not been conducted when the guilty plea was entered and when Petitioner was sentenced. Counsel is never required to perform meaningless acts.

enhancement under § 2F1.1. Petitioner alleges that he was prejudiced by this omission because: (1) had he known the loss amounts would not be challenged by counsel, "there is a reasonable probability that [he] would have not plead guilty and elected to proceed to trial," Mov.'s Trav. at 12; and (2) he received a higher sentencing enhancement than he would have had an appropriate challenge been made. Petitioner states that he requested that Mr. Kavanaugh and Mr. Williams challenge the loss amounts at sentencing and that he provided them with a file of "mitigating evidence to prove his innocents of losses." Mov.'s Trav. at 15.[7] Petitioner also alleges that, after Mr. Kavanaugh requested that he review the Indictment, Plea Agreement, and PSI Report, he "mailed Kavanaugh a letter regarding loss amount contained in PSI report." Mov.'s Trav. at 14. Petitioner further states that Mr. Williams said he would argue the intended loss issue at sentencing, but that Mr. Kavanaugh (who appeared with Petitioner at sentencing) did not do so. *Id.* at 16. According to Petitioner, he "never admitted to the amount of losses," instead "reserv[ing] the losses and intended losses to be argued until sentencing." Mov.'s Trav. at 20. Mr. Kavanaugh and Mr. Williams respond by arguing that the decision not to challenge the loss amounts was sound strategy which was in Petitioner's best interest because it limited his sentencing exposure.[8]

"In assessing counsel's performance, courts defer to reasonable trial strategies and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Covey v. United States*, 377 F.3d 903, 909 (8th Cir. 2004) (internal quotations omitted). *See also Williams v. United States*, 343 F.3d 927 (8th Cir. 2003) (reasonable strategy to advise defendant to maintain guilty plea because doing so benefitted defendant by limiting his sentencing range). Mr. Kavanaugh and Mr. Williams maintain that it was in Petitioner's best interest not to challenge the loss amounts. Petitioner, however, contends that he "could only have benefit[t]ed had counsel challenged loss amounts contained in [the] PSI Report." Mov.'s Supp. Trav. at 7. Based on the Petition, the files, and the record of this case, the Court is unable to conclusively determine whether the decision not to challenge loss amounts was reasonable strategy falling within the wide range of reasonable professional assistance, as contended by Mr. Kavanaugh and Mr. Williams, or whether the failure to object to the loss amounts constitutes ineffective assistance, as Petitioner argues. Specifically, the Court is unable to conclusively determine whether the decision not to challenge the loss amounts was made notwithstanding Petitioner's insistence

---

[7] According to Petitioner, the intended loss amount contained in the Plea Agreement and Presentence Investigation Report was incorrect because it failed to off-set the potential loss amount with available collateral.

[8] In his Amended § 2255 Memorandum, Petitioner appears to argue that the Court incorrectly enhanced Petitioner's sentence, thereby committing reversible error. The Court will only consider this argument as it relates to the ineffective assistance of counsel claim. Because Petitioner did not raise any claim regarding the Court's alleged error on direct appeal, the claim is procedurally defaulted and Petitioner has made no showing which might overcome the default. Further, the right to make such a claim was waived when Petitioner signed the Plea Agreement.

that the loss amounts be challenged. Though the record currently before the Court does tend to refute Petitioner's contention that he insisted the loss amounts be challenged at the time of sentencing and that he provided counsel with the factual support necessary to make such challenges,[9] the record is not conclusive. Because Petitioner has made factual allegations that his counsel failed to challenge the loss amounts in direct contravention of his wishes and that a challenge to the loss amounts would have resulted in a lower sentence.

The Court, as a result of these conclusions, granted Petitioner an Evidentiary Hearing which, as already noted, was conducted on April 6, 2006.

Petitioner's belief that United States Sentencing Guideline 2F1.1 *Commentary* note 8(b)(2000) requires losses for guideline purposes to be calculated in reference to "actual or expected losses to victims" is misplaced. That Note provides:

---

[9]At the time of sentencing, Petitioner did not indicate that he had any objections to the loss amounts. At sentencing, all objections to the PSI were withdrawn, with Petitioner's permission:

| | |
|---|---|
| The Court: | All right. Mr. Kavanaugh, have you, sir, and has Mr. Hairston received and reviewed a copy of the report? |
| Mr. Kavanaugh: | Your Honor, we've received a copy. We've gone over it. We've discussed it. |
| The Court: | All right. And I noted that there were objections. I thought some were resolved. I wasn't sure if all had been resolved. |
| Mr. Kavanaugh: | Your Honor, we did file objections regarding a two-level enhancement for mass marketing. As the Court knows, we were not the original attorney of record. We looked into the matter, we investigated it, and at this time, I would ask leave of court to withdraw those objections. |
| The Court: | All right. |
| Mr. Kavanaugh: | I've consulted with Mr. Hairston. I've explained to him why they do not apply in this case . . . . |
| The Court: | Very well. They are withdrawn. Is that with your permission, Mr. Hairston? |
| The Defendant: | Yes, sir. |

(Sent. Tr. at 2-3). The Court then adopted the factual statements contained in the PSI Report, specifically including the fact that the loss was between $2.5 and $5 million. When asked whether there was any reason not to pronounce judgment upon him, Petitioner stated, "No, sir." (Sent. Tr. at 4).

<u>Fraudulent Loan Application and Contract Procurement Cases</u>

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (<u>e.g.</u>, to expand a grain export business), which he genuinely expected to repay and for which he woyld have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unforeseen event (<u>e.g.</u>, an embargo imposed on grain exports) which would have caused seriousness of the defendant's conduct. Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted.

Clearly, Note 8(b) provides, "where the intended loss is greater than the actual loss, the intended loss is to be used." It is also clear that U.S.S.G. 2F1.1 (2000) applies to situations such as this case, where a person is not directly applying for a loan at a lending institution, but the defendant is in the loan brokerage business. *See U.S. v. Carter,* 412 F.3d 864, 866 (8th Cir. 2005)(where the intended loss is greater than the actual loss, the intended loss is to be used). Where all mortgages have not been foreclosed, lenders were caused to loan more money on loans they would otherwise have loaned with a higher risk of default because a borrower has less incentive to protect equity. Even though a mortgage broker may have intended that loans would be repaid, the broker intended to have lenders with loans that were riskier and less valuable than the lenders thought. The value of intended loss need not be determined with any degree of precision. A reasonable estimate of the loss based on the available evidence will suffice. *Id.* at

869.  *See also U.S. v. Agboola,* 417 F.3d 860, 869 (8th Cir. 2005)(the court need only make a reasonable estimate of the loss, given the available information).  The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim, "or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations." *Id.* at 868.  This case was also a brokerage situation involving the same guideline manual as in this case.

Here, it stands uncontested that there were twenty-one million dollars in loans in which Petitioner was involved that involved fraud.  Mr. Kavanaugh, Mr. Williams and Mr. Wynne knew, and they advised Petitioner, that intended loss was the proper measure of loss under the United States Sentencing Guidelines in his case, considering all of the evidence the Government had presented and considering all of the facts and circumstances known to them, for the purpose of calculating Petitioner's sentence.  They explained the law accurately to Petitioner and he agreed with them that no objections should be made to the Pre-sentence Report.  Petitioner further agreed that the amount of losses stated in the Pre-sentence Report should not be challenged before sentencing and at the Sentencing Hearing.  Contesting the loss amount could likely have resulted in more points being assessed against Petitioner for intended losses, and points for acceptance of responsibility could have been lost.  Petitioner was very capably advised by Mr. Kavanaugh, Mr. Williams and Mr. Wynne and Petitioner agreed with their informed conclusions.

The Eighth Circuit has determined that a waiver of a right to appeal is enforceable if the waiver is knowingly and voluntarily made, and the sentence imposed is in accordance with the negotiated agreement. *Rutan*, 956 F.2d at 829.  However, such waivers are not absolute.  For example, the Eighth Circuit has determined that defendants cannot waive their right to appeal an illegal sentence, which is a sentence imposed in violation of the terms of an agreement.  *DeRoo*,

223 F.3d at 923. In addition, "the decision to be bound by the provisions of the plea agreement, including the waiver provisions, must be knowing and voluntary." *Id*. (citing *Morrison*, 171 F.3d at 568). Even when these conditions are met, however, a waiver will not be enforced where to do so would result in a miscarriage of justice. *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003).

The Eighth Circuit has held that the illegal sentence exception to the general enforceability of an appeal waiver is an extremely narrow exception. *Id.* at 891. Any sentence imposed within the statutory range is not subject to appeal. Specifically, an allegation that the sentencing judge misapplied the Sentencing Guidelines or abused his or her discretion is not subject to appeal in the face of a valid appeal waiver." *Id.* at 892. A sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime. *Id*. (citing *United States v. Greatwalker*, 285 F.3d 727, 729 (8th Cir. 2002)).

Here, the waiver clearly allows Movant to make an ineffective assistance of counsel claim in a § 2255 motion for defects by Mr. Wynne at the time of the guilty plea and Mr. Kavanaugh and Mr. Williams at the time of sentencing. Because a guilty plea has been entered, the focus of a collateral attack under § 2255 is limited to the nature of counsel's advice and the voluntariness of the plea. *Bass v. United States*, 739 F.2d 405, 406 (8th Cir. 1984) (citing *Tollett v. Henderson*, 411 U.S. 258, 266 (1973)). Also, the opinion relates to the issue of ineffectiveness of Mr. Kavanaugh and Mr. Williams at the time of sentencing.

The Court must determine whether Movant's § 2255 states a valid claim for ineffective assistance of counsel. A § 2255 motion may be based upon a violation of the Sixth Amendment right to effective assistance of counsel. The United States Supreme Court has held that a showing of ineffective assistance of counsel requires that: (1) counsel's performance was deficient in that

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and (2) "counsel's deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Auman v. United States*, 67 F.3d 157, 162 (8th Cir. 1995). The test articulated in *Strickland* applies to guilty plea challenges premised upon allegations of ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). To prove the first prong of the test, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. When evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Even if sufficient proof of the first prong exists, relief may only be obtained if a petitioner also proves that counsel's deficient performance prejudiced the case. *Id.* at 697. In order to satisfy the second prong, i.e., the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. The court may address the two prongs in any order, and if the petitioner fails to make a sufficient showing of one prong, the court need not address the other prong. *Strickland*, 466 U.S. at 697; *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000) (holding that "[i]f we can answer 'no' to either question, then we need not address the other part of the test.").

This is a very strong case calling for this Court to defer to reasonable trial strategies and conclude that the conduct of Mr. Wynne, Mr. Kavanaugh and Mr. Williams not only falls within the wide range of reasonable performance, but was exemplary. To prevail here, Petitioner must show his counsel's performance was deficient. The individual performances of Mr. Wynn, Mr. Kavanaugh and Mr. Williams were in no respect deficient. Petitioner fails in his burden of proof

in attempting to show that his counsel, or any of them, made errors so serious that counsel was not functioning as counsel guaranteed to Petitioner by the Sixth Amendment. Additionally, Petitioner fails in his burden of proof in attempting to show that his defense was prejudiced by any of his counsel's performances. On the issue of prejudice, assuming Petitioner was successful in obtaining a one point reduction in his total offense level, based on the amount of actual losses, the sentencing range under the United States Sentencing Guidelines would be 57 to 71 months. His imposed sentence was 64 months, within a sentencing range of 63 to 78 months. There is no showing that any of his counsel's claimed, and unproved errors, were so serious as to deprive Petitioner of a fair trial, a trial whose result is unreliable. Mr. Wynne, Mr. Kavanaugh and Mr. Williams far surpassed the standard of performing reasonably effective assistance. Petitioner's remaining Ground Three claim and his supplement claim against Mr. Wynne fail under *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Tandy Hairston is not entitled to relief under 28 U.S.C. § 2255 for any of the reasons raised in his final argument in Ground Three and his supplement regarding ineffective assistance of counsel of William Wynne, Phillip Kavanaugh and Stephen Williams, for failure to challenge loss amounts at the Change of Plea Hearing and at the time of sentencing.

**IT IS FURTHER ORDERED** that Petitioner's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Judgment [doc. #1] and his Supplement are in all respects DISMISSED with prejudice.

**IT IS FURTHER ORDERED** that the Court shall not issue a certificate of appealability as to Ground Three, to Petitioner's Supplement, or as to Grounds One, Two or Four.

So Ordered this 6th Day of December, 2006.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE